NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

NORTHERN METAL COMPANY,
Respondent.

No. 18775.

United States Court of Appeals,
Third Circuit.

Argued Nov. 3, 1970.

Decided April 6, 1971.

Biggs, Circuit Judge, dissented and filed opinion.

John M. Flynn, Atty., N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Eugene B. Granof, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

Peter M. Stern, Blank, Rome, Klaus & Comisky, Philadelphia, Pa. (Marvin Comisky, Howard I. Hatoff, Philadelphia, Pa., on the brief), for respondent.

Before BIGGS, VAN DUSEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This case comes to us on application of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act as amended (29 U.S.C. § 151 et seq.) for enforcement of an order issued against respondent on May 8, 1969 following proceedings under Section 10(c) of the Act. The Board determined that respondent had violated Section 8(a) (1) of the Act[1] by discharging an employee, Ernest L. Davis, for engaging in concerted activity protected by Section 7 of the Act.[2] Respondent was ordered to cease and desist from the unfair labor practice found, and to reinstate Davis with pay for any wages lost in the interim. The Board's Decision and Order are reported in 175 NLRB No. 145.

The following recital of facts is based upon the trial examiner's findings of fact. Davis was hired by the Company as a laborer, and under the terms of the collective bargaining agreement between the company and the union, was to have been a probationary employee for the first 30 days of his employment. On a regular Friday payday about three weeks after having been employed, he received his pay check covering the previous week's work, which week included the Labor Day holiday, and noticed that it did not include the holiday pay. Upon returning to inquire about the deficiency, Davis met Max Rose, the company's chief executive officer and sole stockholder, and Maurice Chorney, the chief yard superintendent. When he inquired about the holiday pay, the two asked him how long he had been employed by the company and whether he was a member of the union. Davis replied that this was his third week (i. e., that his probationary period had not expired) and that he was not a member of the union. Rose,

---

1. Section 8(a) (1) (29 U.S.C. § 158(a) (1)) provides as follows:
   "(a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title (NLRA § 7) * * *."

2. Section 7 (29 U.S.C. § 157) provides, in part, as follows:
   "Employees shall have the right of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."

thereupon, informed Davis that he was not entitled to holiday pay.[3]

Later in the same day, Davis inquired of the union shop steward about the holiday pay and was informed that since he was not a union member the union could do nothing for him. At the suggestion of the steward, however, Davis saw the union local's financial secretary. He made a similar reply.

Shortly thereafter, Davis again encountered the financial secretary while he was cashing his pay check at a nearby bank and once more inquired whether he was entitled to holiday pay. Again, the reply was substantially the same, although he added "Nobody said that you're not entitled to the holiday pay."

On the following Monday, Davis, during his lunch hour, visited the financial secretary at the latter's work station and secured a copy of the collective bargaining agreement. Upon reading the relevant section dealing with holiday pay, Davis offered his opinion, to Winbush, the financial secretary, that there was nothing in the language that excluded non-union or probationary employees from its provisions; and that he felt he fulfilled the requirements for holiday pay. Winbush advised Davis the union could do nothing for him, since he was not a member [4] (it should be noted, however, that Davis had not requested the union to represent him) and suggested that he again see Rose, the chief executive officer. "If he doesn't do anything, then come back to me and I'll see what I can do."

Later that same day, shortly after he had clocked out, Davis went to Rose's office. He renewed his request for holiday pay for Labor Day, referring to the agreement and pointing out that, as he read the contract, he was entitled to it

because he had worked the days immediately before and after Labor Day. Rose first asked Davis where he got the agreement and Davis, remembering his earlier promise to Winbush not to divulge his source, refused to tell him. Rose then said: "You haven't even been here a month—and you're trying to tell me how to run my business." Davis denied this charge and repeated his claim for holiday pay. Thereupon, Rose informed Davis he should have been a lawyer; the latter responded that one did not have to be a lawyer to read the contract. Rose again replied that Davis was not entitled to holiday pay.

Shortly after the conversation, Rose called in the company's comptroller and instructed him to prepare Davis' final pay check; he was being discharged as an "undesirable employee." There was no further elaboration. The next day, upon finding his time card removed, Davis sought out Rose for an explanation. Rose greeted Davis by holding out an envelope containing his pay check and telling him that the company could not use him any more. Upon inquiring whether he was fired, Rose replied that he could not use a man who tried to tell him how to run his business. Davis denied that he was trying to do any such thing and refused to take the pay check since there was no union representative to witness the firing. He then left the property and promptly proceeded to the Regional Office of the National Labor Relations Board and filed the charges [5] which give rise to this proceeding.

This case raises three questions: (1) whether Davis was engaging in concerted activities for the purpose of mutual aid and protection within the meaning of Section 7 of the National Labor Relations Act, (2) whether this was the reason for his discharge, and (3) wheth-

3. The company did not, as a long standing practice acquiesced in by the Union, pay holiday pay to probationary employees. See footnote 7, infra.

4. Disputes of probationary employees were not subject to the contract's grievance procedure.

5. Davis filed charges against the union and the company. Both charges were dismissed by the Regional Director but General Counsel reinstated the charge against the company.

er enforcement of the Board's order is consistent with our responsibility for the reasonableness and fairness of Labor Board decisions "when viewed, on the record as a whole." See Universal Camera Corp. v. NLRB, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951).

## I. The Concerted Activities Issue

Section 7 of the National Labor Relations Act provides that "[e]mployees shall have the right * * * to engage in * * * concerted activities for the purpose of collective bargaining or other mutual aid and protection * * *." Section 8(a) (1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their Section 7 rights. The primary question presented by this case is whether a single employee acting alone is engaged in protected concerted activity when he presses demands for holiday pay, to which he deems himself entitled under the provisions of a collective bargaining agreement.

The trial examiner found that Davis was discharged because he pressed his claim for holiday pay with the employer. The Act protects only "concerted activities."

The Board would have us hold that Davis' efforts "to enforce" the provisions of the collective bargaining agreement constituted concerted activity. The Board asks us to supply the necessary element of concert from the facts that Davis was presenting a grievance "within the framework" of the collective bargaining agreement and that such grievance "affects the rights of all[6] employees in the unit." The Second Circuit has followed such an approach, creating a kind of "constructive" concerted activity, in NLRB v. Interboro Contractors, Inc., 388 F.2d 495 (2d Cir. 1967), where the court stated that "activities involving attempts to enforce the provisions of a collective bargaining agreement may be deemed to be for concerted purposes even

in the absence of * * * interest (on the part of) fellow employees." That case represents a clear expansion of the Act's coverage, in the face of unambiguous words in the statute. The Act surely does not mention "concerted *purposes*." (Emphasis added.) This is clear from the language of the Act, and was emphatically recognized by this court in Mushroom Transportation Co. v. NLRB, 330 F.2d 638 (3d Cir. 1964). *Interboro Contractors* appears to create a legal fiction, constructive concerted activity, in an effort to support a judicial conception of a sound interpretation of the Act. We are unwilling to adopt such a fiction.

The Seventh Circuit has held that, in order to prove concerted activity under Section 7, "it is necessary to demonstrate [at least] that the activity was for the purpose of inducing or preparing for group action to correct a grievance or a complaint." Indiana Gear Works v. NLRB, 371 F.2d 273, 276 (7th Cir. 1967). The court cited our circuit's decision in *Mushroom,* supra, which contains the most expansive view of "concerted activity" in this circuit. The court in *Mushroom* included within the meaning of the term not only group action, but also "talk looking toward group action." Even this definition of concerted activity stretches somewhat the normal meaning of the term in order to facilitate the policies of the Act. Webster's New International Dictionary (2d ed. 1947) defines "concert" as "agreement in a design or plan; union formed by mutual communication of opinions and views; accordance in a scheme; harmony; simultaneous action" and "concerted" as "mutually contrived or planned; agreed on." We do not believe the purpose of the Act would be served by expanding the limits of *Mushroom* to include activity which could be considered "concerted" only in a fictional sense.

We therefore hold that Davis was not engaged in concerted activities

6. It is noted that Davis' grievance did not affect the rights of all employees, but only those of the relatively few probationary employees.

within the protection of Section 7 of the Act.

Even if we were to adopt *Interboro* as the rule of this circuit, however, we would still be unable to enforce the Board's Order on the record as it now stands. Since its decision in *Interboro*, the Second Circuit has had an opportunity to expand upon that case's rationale in NLRB v. John Langenbacher Co., 398 F.2d 459, 463 (2d Cir. 1968). The court there noted that an attempt by employees to enforce their understanding of the terms of a collective bargaining agreement "is a protected activity * * * if the employees have a reasonable basis for believing that their understanding of the terms was the understanding that had been agreed upon * * *."

It is clear from the trial examiner's findings of fact that he did not consider whether there was a *reasonable basis* for Davis' belief that he was entitled to holiday pay under the contract. He found, simply, "that Davis was discharged for pressing for the holiday pay *to which he thought he was entitled* under the collective-bargaining contract." (Emphasis added.) Therefore, even under *Interboro*, we would be required to remand this case to the Board for a finding as to whether Davis had a "reasonable basis" for his belief, particularly since we believe that, on the basis of the record before us, this is a close factual question.[7] Of course, our decision not to follow *Interboro* makes such a remand unnecessary.

## II. The Cause for the Discharge

For the reasons stated under I, it is unnecessary for us to determine whether or not there is substantial evidence to support the Board's finding that Davis' activities in attempting to obtain holiday pay were the cause of his dismissal.

## III. This Court's Duty to Assure Reasonableness and Fairness of Board Decisions

In Universal Camera Corp. v. NLRB, supra, 340 U.S. at 490, 71 S.Ct. at 466, the Supreme Court of the United States said:

We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly

---

7. In Davis' favor we note that:

(a) the contract did not, on its face, negate the possibility that probationary employees were entitled to holiday pay; and,

(b) Winbush, the union representative, did not disabuse him of his belief that he was so entitled, and in fact told Davis to come back to see him if Rose continued in his position.

On the other hand, we note that:

(a) Rose told Davis at each meeting that, as a probationary employee, he was not entitled to holiday pay;

(b) Winbush was always evasive and never confirmed Davis' belief in his entitlement; and

(c) it was stipulated at the hearing that, as a matter of long-standing practice and on the basis of an understanding between the company and the union, probationary employees were in fact *not* entitled to holiday pay. If there were a remand in this case, it would certainly be crucial for the Board to inquire further as to whether Davis was aware of this fact, for, if he was, his belief in his own entitlement to holiday pay could hardly be found to have been "reasonable."

precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

Under this mandate, we believe there is an alternative and independent basis for denying enforcement of the Board's order. Our holding in I, supra, makes it unnecessary to remand this case to the Board. Had we found differently, we would nonetheless deny enforcement under *Universal Camera* until the Board, by remand to its trial examiner or in some other way, explained further the basis for the following actions of the trial examiner:

(1) Despite the facts—

(a) that Rose was dead and his version of the events was unavailable;

(b) that Davis had been involved as the charging party in numerous unfair labor practice cases;

(c) that Davis had an "inability to recollect certain details"; and

(d) that Davis "was confusing his contacts with Rose,"

the trial examiner credited *all* of Davis' testimony *needed* to make out a case against the company, even when it conflicted with testimony offered by the company (which was rejected in every case by the trial examiner), while he

rejected *part* of Davis' testimony as "implausible" (App. 11).[8]

(2) In evaluating the testimony of various witnesses for the employer, the trial examiner rejected the testimony of Davis' supervisor regarding Davis' allegedly unsatisfactory job performance in part because it was uncorroborated. The trial examiner also rejected Ellison's testimony regarding the last confrontation between Rose and Davis in part because it was uncorroborated.[9] The trial examiner also noted that none of the people who worked with Davis and who, according to the testimony of Davis' supervisor, complained about Davis' frequent absences from the job site were called to testify. Similarly, the trial examiner noted that the payroll clerk who made an entry on Davis' record, "Discharged—Unsatisfactory Performance of duty," was not called to testify. This, of course, is a proper way of evaluating testimony. But it should be noted that, while *none* of Davis' testimony was corroborated, lack of corroboration was not held against Davis. This court has disapproved of causing an employer to prove that a discharge is for a proper reason rather than requiring the General Counsel to bear the burden of proof before the trial examiner. NLRB v. Rockwell Mfg. Co., 271 F.2d 109, 115 (3d Cir. 1959). In this case, the opinion of the trial examiner suggests that he effectively erected a presumption *against* the veracity of testimony offered

---

8. The rejected testimony of Davis was, of course, unnecessary to make out an unfair labor practice under the Trial Examiner's view of the law.

9. Mr. Ellison was a messenger-driver for the company and a union member. He testified that he was sitting outside Rose's office during that conversation. His account of it is as follows:

Mr. Davis walked in and asked Mr. Rose how he found out that why he didn't get paid for the holiday. Mr. Rose told Mr. Davis, "The reason you didn't get paid for the holiday is you haven't been here thirty days and I pay all of my employees by the rule of the contract." He said, "Mr. Rose,

that don't have anything to do with it— the contract—this is a national holiday and every man should be paid for Labor Day." So Mr. Rose said, "Is that correct?" He said, "Yes." He said, "Mr. Rose, I want to get paid for Labor Day.["] Mr. Rose asked him, "Are you threatening me?" He said, "No, but if you don't pay me, I'm going to take you down to the Labor Board * * *" (Emphasis added)

If Mr. Ellison's testimony had been credited by the trial examiner, it would have gone far toward showing that Davis was not, in fact, attempting to enforce the provisions of the collective bargaining agreement.

by the employer and thereby improperly altered the burden of proof.

The Petition to enforce the Board's Order of May 8, 1969 will, therefore, be denied.

BIGGS, Circuit Judge (dissenting).

## I. *The Concerted Activity Issue*

Section 7 of the National Labor Relations Act states that "[e]mployees shall have the right \* \* \* to engage in \* \* \* concerted activities for the purpose of collective bargaining or other mutual aid or protection \* \* \*." Section 8(a) (1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their Section 7 rights. The question presented for our determination is whether efforts by an employee to enforce a provision of the collective bargaining agreement are per sé "concerted activity."

Since there are no Third Circuit cases which consider the specific issue *sub judice,* I would adopt the teaching of a recent Second Circuit opinion by Chief Judge Lumbard in NLRB v. Interboro Contractors, Inc., 388 F.2d 495 (1967). In that case the court stated:

"[W]hile interest on the part of fellow employees would indicate a concerted purpose, activities involving attempts to enforce the provisions of a collective bargaining agreement may be deemed to be for concerted purposes even in the absence of such interest by fellow employees." Id. at 500.

Thus, this case holds that efforts by an employee to enforce a collective bargaining agreement are considered concerted activity per sé.[1]

I think that this court should adopt the holding of *Interboro* not only because it has been followed by the National Labor Relations Board for many years[2] but also because it represents a sound interpretation of Sections 7 and 8(a) (1)

---

1. In NLRB v. Selwyn Shoe Mfg. Corp., 428 F.2d 217, 221 (8 Cir. 1970), the court stated: "We think it obvious that rights secured by such \* \* \* [a collective bargaining] agreement, though personal to each employee, are protected rights under § 7 of the Act because the collective bargaining agreement is the result of concerted activities by the employees for their mutual aid and protection." The court held that it was an unfair labor practice for the employer to discharge an employee for vigorously presenting a personal grievance based upon a clause in the collective bargaining agreement. The only fact in *Selwyn Shoe* which distinguishes that case from the instant case is that the employee in that case properly invoked the union grievance procedure which was available to her. In the case at bar, Davis could not utilize the grievance machinery that was available to regular employees since he was not a member of the union.

It would be unfair to deny the benefits of the Act to probationary employees who are not yet entitled to utilize the union grievance machinery while extending benefits to regular employees who are entitled to process their grievances through the union. The artificiality of such a distinction has been pointed out in a recent decision of the Board, J. A.

Ferguson Constr. Co., 172 NLRB No. 165 (1968). The Board, affirming the trial examiner's findings and conclusions, stated:

"As to the May 1 discharge, the only reason assigned by the employer for the discharge was Tolot's alleged conduct on April 30 in leaving his work station without permission to protest a violation of the union contract, instead of processing his complaint through the steward under the contract's grievance procedure.

\* \* \* \* \*

"*Even assuming that Tolot's request was in derogation of the grievance provisions of the contract,* his conduct, nevertheless, constituted concerted activity since the 'grievance' pertained to a violation of a condition of employment prescribed in the contract, affecting not only Tolot but also all the bricklayers on the job. Since Tolot's conduct was protected concerted activity, the employer, therefore, violated Section 8(a) (1) of the Act by discharging Tolot because of such conduct." (Emphasis added.)

2. *See, e. g.,* H. C. Smith Construction Co., 174 NLRB No. 180 (1969); New York Trap Rock Corp., 148 NLRB No. 41 (1964).

of the Act. When an individual employee attempts to enforce a provision of a collective bargaining agreement, he is asserting a "collective" right under a collective contract. Although an individual employee, in processing his complaint based upon a contractual provision, might be concerned primarily with accomplishing a result which will benefit him personally, his success will redound to the direct benefit of all employees similarly situated. In the instant case, Davis was concerned primarily with convincing Rose that *he* was entitled to the holiday pay under the collective bargaining agreement. However, Davis was, in effect, representing all other probationary employees (both present and future) for, if successful, his efforts would benefit this class of persons. "Where an individual employee asserts a right found in a collective-bargaining agreement, it is reasonable to state he is extending the terms protecting union activity." Illinois Ruan Transportation Corp. v. NLRB, 404 F.2d 274, 285 (8 Cir. 1968) (dissenting opinion of Judge Lay). Also see NLRB v. Century Broadcasting Corp., 419 F.2d 771, 780 (8 Cir. 1970).

It might be argued that the adoption of the *Interboro* rule will encourage employees to bypass the regular grievance procedure. This result is unlikely, except in the rare situation, where the employee is not entitled to union representation. Where an employee belongs to the union and is entitled to union representation, he would undoubtedly request the union to process his grievance. Furthermore, Congress has put its imprimatur on individual processing of grievances. Section 9(a) of the Act, 29 U.S.C. § 159(a), provides:

"Representatives * * * selected for purposes of collective bargaining by the majority of the employees * * * shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That any individual employee * * * shall have the right at any time to present grievances to [his] employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective bargaining contract or agreement then in effect: *Provided further,* That the bargaining representative has been given opportunity to be present at such adjustment."

The first proviso was meant to be a buffer between the employee and his union, so that the employer *may* hear an individual's grievance without running afoul of Section 9(a), which makes the union the exclusive bargaining agent. Black-Clawson Co. Paper Machine Division v. International Ass'n of Machinists, 313 F.2d 179, 185 (2 Cir. 1962); Comment, Federal Protection of Individual Rights Under Labor Contracts, 73 Yale L.J. 1215 (1964).

The majority opinion indicates that even if the *Interboro* rule were adopted, a remand to the Board would be necessary for a finding as to whether Davis had a reasonable basis for his belief that he was entitled to the holiday pay under the collective bargaining contract. I agree that this procedure should be followed and, if the Board determines that Davis did have a reasonable basis for his belief, the Board's order, as amended, should be enforced.

## II. *The Cause for the Discharge*

I conclude that Davis was engaged in concerted activity within the meaning of the Act. I think I should go further and give my view as to whether this was the reason for his discharge. Although one could conclude that Davis was discharged for a proper purpose I think that the record does not lack substantial evidence to support the finding of the Board that Davis was discharged for pressing for the holiday pay to which he thought he was entitled. Universal Camera Corp. v. NLRB, 340 U.S. 474; 71 S. Ct. 456, 95 L.Ed. 456 (1951). The resolution of questions of credibility rests with the Board. NLRB v. Wings & Wheels, Inc., 324 F.2d 495, 496 (3 Cir. 1963).

III. *This Court's Duty to Assure Reasonableness and Fairness of Board Decisions*

(1) As an alternative basis for denying enforcement of the Board's order, my Brother Rosenn indicates that the trial examiner failed to follow the teaching of *Universal Camera* by crediting all of Davis' testimony needed to make out a case against the company even when it conflicted with testimony offered by the company while rejecting part of Davis' testimony as implausible. Thus, my Brother strongly implies that *Universal Camera* requires a court of appeals to scrutinize the credibility findings and reasoning of the Board. I think that *Universal Camera* merely stands for the proposition that the scope of review of NLRB decisions under the National Labor Relations Act, 29 U.S.C. § 160(e), is precisely the same as the scope of review under the Administrative Procedure Act, 5 U.S.C. § 705— whether the decision of the agency is supported by substantial evidence on the record considered as a whole. *Universal Camera* does not purport to alter the primary function of the agencies in making fact determinations. As we recently stated in Ginsburg v. Richardson, 436 F.2d 1146 (1971): "[i]t is unnecessary for this court to be in accord with all of the examiner's findings and reasoning as long as his ultimate conclusion is based upon substantial evidence." Also see Lester v. Celebrezze, 221 F.Supp. 607, 611 (E.D.Ark.1963). While it was certainly permissible for the examiner to discredit all of the employer's testimony (see NLRB v. John Langenbacher Co., 398 F.2d 459 (2 Cir. 1968)), it was likewise permissible for him to reject only part of Davis' testimony without rejecting all of it. The rule *"Falsus in uno, falsus in omnibus"* is merely permissive and not mandatory in a trial examiner's evaluation of credibility.

(2) The majority opinion also states that the trial examiner "erected a presumption *against* the veracity of testimony offered by the employer and thereby improperly altered the burden of proof." In order to demonstrate this the majority lists four situations where lack of corroboration was held against the company while noting that lack of corroboration was not held against Davis. While I agree that the burden of proving an improper discharge is upon the General Counsel, I do not understand how the General Counsel's failure to corroborate Davis' testimony and the trial examiner's omission of any reference to such lack of corroboration can constitute a shifting of the burden of proof. Under the trial examiner's view of the law, and what I deem to be the correct view, Davis was only required to prove that he had been discharged for pressing his contractual grievance with Rose. The only person who ever overheard these conversations between Davis and Rose was Ellison—the company's main witness. Thus, the opportunity to corroborate Davis' testimony never reasonably presented itself. It was unnecessary for the General Counsel to corroborate Davis' denial of the company's version of the circumstances surrounding his discharge—that he had been discharged because he was an unsatisfactory employee. While such a course would have made the General Counsel's case even stronger, I do not think that this lack of corroboration and the failure of the examiner to note such lack of corroboration constituted a shifting of the burden of proof, particularly where the General Counsel had already introduced substantial evidence showing that the discharge was improper. In other words, the burden on the General Counsel of proving that the discharge was improper does not mean that he was required to corroborate the negation of the employer's version of the facts.[3]

For these reasons I respectfully dissent.

---

3. In the instant case, Davis negated the employer's version by denying that he had ever been warned of his unsatisfactory work performance.