NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SLOTKOWSKI SAUSAGE COMPANY,
Respondent.

No. 79-1974.

United States Court of Appeals,
Seventh Circuit.

Argued April 3, 1980.

Decided May 8, 1980.

Robert Tendrich, NLRB, Washington, D. C., for petitioner.

Norman Light, Chicago, Ill., for respondent.

Before CUMMINGS, SPRECHER and BAUER, Circuit Judges.

SPRECHER, Circuit Judge.

The essential question upon this application for enforcement of an N.L.R.B. order is whether numerous unilateral attempts by an employee outside a bargaining unit to promote himself into the unit and

into a higher-paying position constitute protected concerted activity. Under the facts of this case we hold that such activity is not protected concerted activity.

Inasmuch as the Administrative Law Judge found the employee to be a credible witness and the Company's witnesses to be unworthy of belief, wherever there is any conflict in the facts as hereafter narrated, only the employee's version and documentary evidence are relied upon.

I

Slotkowski Sausage Company maintains its place of business in Chicago, Illinois, where it is engaged in the processing and packing of sausage and related meat products. Its 79 to 80 employees include about 55 members of two labor unions which have contractual relations with the Company. Highway Drivers, Dockmen, Spotters, Rampmen, Meat, Packing House and Allied Products Drivers and Helpers, Office Workers and Miscellaneous Employees, Chicago and Vicinity, Local 710, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters) represents four of the Company's truck drivers. The 51 remaining union members belong to Amalgamated Butchers and Meat Cutters of North America, Local 100 (Meat Cutters).

The Company has maintained contractual relations with the Teamsters and the Meat Cutters for over 25 years. Prior to this proceeding the Company had never been charged with an unfair labor practice, as the Board noted in its order here under review.

II

Bernard Jeczalik applied for employment with the Company after seeing a newspaper advertisement. He testified before the Administrative Law Judge (Tr. 49–50):

Q. And do you remember the nature of the advertisement in the *Back of the Yards Journal*?

A. No.

Q. It was for a truck driver?

A. It said Slotkowski Sausage.

Q. It just said Slotkowski Sausage, period?

A. There were a lot, I didn't read them. The place was hiring so I went there for a job.

Q. You went there for what kind of a job?

A. I didn't know what they had available.

Q. You went there for any job they had available?

A. Right.

Q. Okay. What job did they tell you they had available when they took you for employment?

\* \* \* \* \* \*

A. They said we will move you around for a little while until we find out the department that you're best suited for.

Q. And what did you understand that position entailed?

A. I didn't know.

Q. So, you were willing to do whatever it is they asked you to do?

A. Yes.

See also Tr. 74.

Jeczalik was 27 years old, had a high school education, and listed in his application three previous employments, each lasting about two years. The first was in a shipping position, the second, with City Foods, Inc., was as a driver and meat packer, and the most recent was an all-around employee ("shipping, receiving, driver, frozen food chef"). Co. Ex. 2.[1] The interviewer for the Company noted on the application that "I feel this man would be capable of doing more than one job." *Id.*

Jeczalik further testified (Tr. 21–22):

A. Leonard [Slotkowski, the Company's president] reviewed my application and then he asked me if I was a member of any union, and I told him no; and he said when you worked at City Foods were

1. Exhibits presented by the Company in the proceedings below are cited "Co. Ex. . .";  those presented by the N.L.R.B.'s General Counsel are cited "NLRB Ex. _ _ _ _."

you in the union, and I said no; and then he asked me if I had—if I could be to work on Monday, and I said yes. He said because most [of] the people go out Sunday and don't come in on Monday to work, and I said I'll be here; and he said I can't start you off that much, and I said well how much, and he said $3.75 and a substantial increase after 30 days; and I said okay it sounds all right, and he says well if you pass the physical you can start tommorrow [sic].

Q. When did you start working?

A. October 21, 1977.

Q. To what department were you assigned?

A. Shipping department.

Q. During your first 30 days of employment, in what department did you actually work?

A. In the basement I don't know the department.

\* \* \* \* \* \*

Q. During your first 30 days with the company, what job duties did you perform?

A. Preparing hams for smoking, and after smoking removing them from the boxes that are used, generally, moving freight, handling of sausage.

After six or seven days of work, Jeczalik complained to one of his supervisors that he was "hired for the shipping department." Tr. 24. About three weeks later he complained again. Tr. 24. At the end of November he began working in the shipping department, where his duties consisted of loading and unloading trucks, packaging products on the scales and filling orders in the cooler. Tr. 24–25.

Jeczalik further testified that early in December he also began driving some of the Company's vehicles as well as performing loading and shipping duties. Tr. 25–26. He testified (Tr. 54–55, 57):

Q. \* \* \* do you know a driver, a truck driver by the name of Henry Mickiewicz?

A. Yes, if that is Hank.

Q. Yes.

A. Yes.

Q. And do you know that his job was that of a truck driver?

A. Yes.

Q. Do you know if Mr. Hank Mickiewicz was off work from December 14 to January 9?

A. I believe those are the dates.

Q. Was any mention ever made to you that Henry Mickiewicz was off work from December 14, to January 9?

A. Yes.

Q. What were you told about Henry Mickiewicz?

A. That he stepped off the dock and twisted his knee or dislocated, or whatever.

\* \* \* \* \* \*

Q. Were you taking his place?

A. Right.

While the injured driver was off the job, Jeczalik drove Company vehicles a substantial part of the time. Tr. 60. After the driver returned to work, Jeczalik spent 10 to 20 hours a week working on the scale, 10 to 15 hours a week loading and unloading, and some part of each week driving vehicles. Tr. 59–60. The scale work, loading, and unloading work were, according to Jeczalik, shipping department duties. Also some of the driving included driving the Company station wagon, which was used for deliveries on boulevards and when finer foods were to be delivered in unmarked vehicles. Tr. 57. For the entire period of Jeczalik's employment with the Company, he was designated on Company records and on check stubs given to him, as working in Department 17, which was the shipping department. NLRB Exs. 3, 8. As he was promised when hired, he was paid $3.75 an hour for 30 days and his wages were then increased to $4.25 an hour. Tr. 24, 29; NLRB Exs. 3, 8; Co. Ex. 2.

When asked the relative difficulty of working in the basement and driving a truck, Jeczalik testified (Tr. 58):

A. Comparing as far as hard, both of them were hard work; but I enjoyed one more than the other.

Q. And which did you enjoy more than the other?

A. Basically hard work. What I already stated, in the basement and the truck driving, yes.

Q. What about the shipping and loading dock in back of the scale. How does that fit in?

A. It all fits in together. It's all part of one job.

Jeczalik's hours were from 7:00 in the morning until 3:30 in the afternoon. Tr. 29. During the approximately 100 days that he worked for the Company, he was absent from work 8 or 10 days. Tr. 152. He put in some overtime for which he was paid time and one-half. NLRB Ex. 3.

At the end of January, 1978, Jeczalik spoke to Adam Slotkowski, saying "I have been here over 90 days [and] I'd like to get into the teamsters union." Adam responded by saying "that's a touchy subject." Jeczalik replied that he would "like the Health, and Welfare, and the Pension fund and everything." Tr. 32.

On February 6, 1978, Jeczalik talked to Leonard Slotkowski (Tr. 34):

I asked Leonard if he talked to Adam, and he said yes. I said what did you decide, he says why do you want to join the union. I said well they got a good pension and sound job security, health and welfare and everything. He says well I've got those things after you've been here five years. I said there's no job security, and then he says well what do you know about AFL–CIO Meat Packers; I say no I'm a driver, I don't want to pack meat; and he says well I'll give you an answer in one or two days.

Jeczalik took a route and when he returned at 3:30 in the afternoon, his time card was gone and he was told that he was laid off. Tr. 34–35. On February 13, he was told by Leonard Slotkowski that he was laid off for lack of work. Tr. 37–38.

On March 6, the Company sent Jeczalik a telegram which read "Report for work Tuesday March 7th at 7 a. m." NLRB Ex. 4. He was rehired at $4.25 per hour. Tr. 38.

On Tuesday, March 7, he reported to work at 7:00 a. m. and was assigned to the main floor to weigh meat and write up orders. On March 8, he failed to report to work at the assigned time, calling in at about 11:00 a. m. to say that he had personal business to take care of. On March 9, he was told to report at 6:00 a. m. and commenced work in the scale room but was reassigned during the day to the basement where he weighed and packaged hams. On Friday, March 10, he was assigned to work at 7:00 a. m. in the basement, weighing and packaging hams. On Monday, March 13, he started work in the basement at 6:45 a. m., weighing and packaging hams. At the end of the day he quit the job. Tr. 65–68.

On February 9, 1978, Jeczalik had brought an unfair labor practice charge against the Company.

### III

The Administrative Law Judge concluded that the Company "violated Section 8(a)(3) and (1) of the Act by laying off Jeczalik for engaging in concerted and protected activity and to discourage his membership in the Teamsters."

Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of rights guaranteed by section 7.29 U.S.C. § 158(a)(1). Section 7 provides that employees shall have the right "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157.

Section 8(a)(3) makes it an unfair labor practice for an employer to discourage membership in a labor organization "by discrimination in regard to hire or tenure of employment or any term or condition of employment . . . ." 29 U.S.C. § 158(a)(3).

The Board did not adopt the ALJ's findings or conclusions as to a violation of section 8(a)(3), but only as to section 8(a)(1), holding that Jeczalik, "while not acting in concert with other employees not directly engaging in union activities, nevertheless was discharged for what the Board has long

held to be the protected concerted activity of seeking benefits under the provisions of a collective-bargaining agreement . . ." 243 NLRB No. 143, at n.1.

The ALJ also found, and the Board agreed, that the Company violated section 8(a)(1) by illegally interrogating Jeczalik on October 20, 1977 and February 6, 1978, and that after his discharge, he was not reinstated to a substantially equivalent position.

The Board has applied for enforcement of its order.

## IV

Jeczalik applied for any job the Company had available, stated that he was willing to do whatever was asked of him, and was told that he would be moved around until the Company found the department he was best suited for. Although formally assigned to the shipping department, he worked some of his three-and-one-half month tenure in the basement, some in the shipping department and some as a part-time driver. After a few days on the job, he began complaining; three weeks later he complained again; and after three months he again complained; and finally he complained on the day he was laid off.

The gist of the complaints was his desire to move from the basement to the shipping department and then from the shipping department to the position of full-time driver. His discussion of the union and union benefits occurred only in the context of his attempting to promote himself from a $4.25 per hour all-around employee to a $7.75 per hour permanent truck driver. While it is an understandable and sometimes admirable trait to engage in verbal self-promotion, it cannot be converted into reality through the device of an unfair labor practice charge. If this were so, the chronic complainers, generally considered in the business world as the least desirable type of employees, would automatically promote themselves into the best jobs, while diligent and loyal but reserved employees would be egregiously discriminated against and held back. Furthermore, no court has ever suggested that management be divested of the power to promote without discrimination in favor of chaotic self-exercise of that power by each employee.

Not only did this Company employ a person looking for any kind of work, but it scrupulously raised his wage rate from $3.75 to $4.25 in 30 days exactly as promised. Also exactly as promised, Jeczalik was moved around from position to position and from department to department until the Company could find the right place for him. It is pertinent that even the employee was aware that his diverse duties "all fit in together" as "part of one job." Tr. 58.

The Company's current agreement with the Teamsters contains no union security clause. There is no requirement that all drivers become members of the union, but all of the Company's employees who are classified as, or become, truck drivers receive the benefits of the collective bargaining agreement. Jeczalik's problem was that he was not employed as a driver, he was not promoted to the position of driver, and he was never a part of the Teamsters' collective bargaining unit.[2] As an all-around employee he substituted for an injured driver for a period and also did some driving as part of his general duties. Under these facts, Jeczalik's numerous complaints were not, as the Board indicated, "the protected concerted activity of seeking benefits under the provisions of a collective-bargaining agreement . . . ." They were unprotected unilateral attempts to promote himself into a superior position.

In *Indiana Gear Works v. N. L. R. B.*, 371 F.2d 273 (7th Cir. 1967), we held that "in order to prove a concerted activity under Section 7 of the Act, it is necessary to demonstrate that the activity was for the purpose of inducing or preparing for group action to correct a grievance or a com-

---

2. The ALJ stated: "I do not hold that Jeczalik was covered under the Teamsters' agreement." Neither the ALJ nor the Board referred to the fact that the Teamsters' collective bargaining agreement permitted the use of "extra men." Art. 12, Section 5. This apparently contemplates that at least one person could act as even a full-time driver without being otherwise covered by the agreement. Jeczalik never became a member of the Teamsters' Union. Tr. 150.

plaint." *Id.* at 276. We added that "a complaint or gripe by an employee is not a concerted activity" standing by itself. *Id.* In that case a single employee, dissatisfied with the amount of a wage increase, was discharged for posting in the plant sarcastic cartoons relating to the increase.

In *N. L. R. B. v. Northern Metal Co.*, 440 F.2d 881 (3d Cir. 1971), the employee was discharged as an "undesirable employee" about three weeks after he was employed for complaining about not receiving holiday pay for the Labor Day holiday. *Id.* at 883. The Third Circuit found that the employee was not engaged in concerted activity and that his discharge was justified.

In *N. L. R. B. v. Buddies Supermarkets, Inc.*, 481 F.2d 714 (5th Cir. 1973), a milk driver's complaints about his method of compensation led to his discharge as a "chronic complainer." *Id.* at 717. The Fifth Circuit held that he "was discharged solely because of his individual griping and complaining, activity which is beyond the scope of the § 8(a)(1) protections." *Id.* at 720 [footnote omitted].

In *Aro, Inc. v. N. L. R. B.*, 596 F.2d 713 (6th Cir. 1979), the court held that the fact that "the Company denied Williams re-employment due to her repeated complaints . . . in no way supports a conclusion that the Company violated § 8(a)(1) of the Act." *Id.* at 717–18.

The Board relies upon *N. L. R. B. v. Ben Pekin Corp.*, 452 F.2d 205 (7th Cir. 1971). In that case the discharged employee had belonged to the union for 17 years and had worked as a janitor for the company for 18 months. After receiving a notice from his union that janitors were entitled to a $75 per month increase and since he had only received $27, he questioned his supervisor and "[i]n the heat of battle" he asked whether there had been a pay-off. *Id.* at 207. For this he was discharged and we concluded that he was engaged in a protected concerted activity, saying:

> In this case, the discharged employee was repeatedly told by his union representatives that he was entitled to a $75-a-month wage increase; there was no written collective bargaining agreement to

which he could refer; instead of being given any rational explanation by the Company or the Union business agents for his failure to receive the expected increase, he was in effect told to "take it or leave it." In the heat of battle, he asked whether there had been a pay-off; this was asked only of the union vice-president and a co-worker. He denied that he had repeated this question to Pasquinelli. The repeating of the allegation at the Union meeting on the Company premises was at the express solicitation of one of the business agents.

*Id.*

Here the employee was discharged after chronic complaining while not engaged in protected concerted activity. The discharge being permissible, it is immaterial whether Jeczalik was reinstated to a substantially equivalent position.

V

The ALJ and Board also found that the Company violated section 8(a)(1) by illegally interrogating Jeczalik on October 20, 1977 and February 6, 1978.

The October 20 interview was not specified in the complaint as a violation but the ALJ held that nevertheless it was fully litigated by the parties and then found it illegal and coercive.

■ Particularly in a plant where two unions have outstanding contracts, it is not illegal to ask an applicant in a pre-employment interview or application, whether he belongs to a union and if so, which one. *N. L. R. B. v. MacCollum Paper Co.*, 367 F.2d 761, 763–64 (7th Cir. 1966). Here "there was no anti-union background nor was [the interrogation] associated with or a part of a pattern or course of conduct hostile to unionism." *N. L. R. B. v. John S. Swift Co.*, 277 F.2d 641, 646 (7th Cir. 1960).

■ In regard to the February 6 conversation, the ALJ himself expressed doubts:

> The issue is not wholly clear-cut. On the one hand, Jeczalik initiated the conversation by asking Slotkowski what he had decided about his getting into the Teamsters. I do not deem that, when Slotkowski asked Jeczalik why he wanted to join

the Teamsters, Slotkowski was engaging in interrogation. Jeczalik had already made known his desire, and it was only natural for Slotkowski to ask the question, rather than remain mute.

Slotkowski's next question was neutral and non-coercive: "[W]hat do you know about AFL–CIO Meat Packers?" The Company had 51 employees in the Meat Packers union and only four in the Teamsters. If Jeczalik, the all-around handyman, wanted to join a union, his greatest opportunities in the Company would be as a Meat Packer. In fact, Slotkowski was doing Jeczalik a favor by pointing out the alternatives.

There is no evidence to support the ALJ's conclusion that the Company engaged in illegal interrogation.

The application to enforce the order is denied.

ENFORCEMENT DENIED.