**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERBORO CONTRACTORS, INC., Respondent.**

Nos. 92–93, Dockets 31213–31214.

United States Court of Appeals
Second Circuit.

Argued Oct. 11, 1967.

Decided Dec. 22, 1967.

Peter M. Giesey, National Labor Relations Board, Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Associate General Counsel, and Lawrence M. Joseph, National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Joseph Goldberg, New York City, for respondent.

Before LUMBARD, Chief Judge, SMITH and FEINBERG, Circuit Judges.

LUMBARD, Chief Judge:

This case comes before us by petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, for enforcement of an order issued against respondent on March 31, 1966. 157 NLRB No. 110. The Board determined that respondent had violated Section 8(a) (1) of the Act by discharging two employees, John and William Landers, for engaging in activities which were protected under the Act; respondent was ordered to cease and desist from the unfair labor practice found and to grant the Landers reinstatement and back pay. The question presented to this court is whether there was substantial evidence to support the Board's findings that the Landers' presentation of complaints about respondent's alleged violations of the collective bargaining contract was concerted activity protected under Section 7 and that these complaints were the reason for the discharges. We conclude that the Board's findings are supported by substantial evidence on the record considered as a whole and enforce the Board's order.

The testimony at the hearing before the trial examiner revealed the following facts. On March 23, 1965, brothers John and William Landers were hired over the telephone by respondent's president Kleinhans to work as steamfitters on a construction project at Tratman Avenue in the Bronx. According to John, Kleinhans said that it would be an "8-hour job" and would pay "expense money"; [1] Kleinhans testified that he did not give any such promises.

When they arrived at the jobsite on March 25, the Landers brothers met Novak, who was also employed by respond-

---

1. The collective bargaining agreement requires that double-time be paid for all hours in excess of the standard 7-hour day; thus an "8-hour" job is one that regularly provides for one hour's work at overtime pay. "Expense money" is an hourly sum over the amount provided for in the collective bargaining agreement; apparently, it was not unusual for steamfitters to receive this extra pay in some circumstances.

ent as a steamfitter. John found that Novak had been working alone for several days while his partner Koster—who was respondent's only other employee on this job—had been absent because of sickness; the collective bargaining contract and the New York City Fire Regulations require that steamfitters work in pairs.

A short while later Soebke, respondent's supervisor, visited the jobsite. John asked him about the "8-hour job" and "expense money." Soebke answered that the Landers would have to speak to Kleinhans about this.

Soebke assigned John to do some welding and William to do some other work. The Landers refused to work separately, claiming that the contract required them to work together. John pointed out to Soebke that Novak had been working without a partner and expressed doubt that Novak was an "A-man" qualified to work as a steamfitter.[2] John also said that he was going to get the union business agent to visit the jobsite. Soebke then assigned both Landers to work together and left the site. John afterwards called the union business agent.

On the following day, Koster, who was the foreman, returned and John repeated the complaints to him. John also told Koster of his conversation with Kleinhans concerning the overtime and expense money; Koster confirmed Soebke's statement that Kleinhans rarely appeared at the jobsite. John made one phone call to Kleinhans' office in order to discuss the 8-hour day and expense money, but he was unable to reach Kleinhans.

The same day, the union business agent arrived at the site and heard John's complaints. The agent told Koster that the men were to work in pairs and that another steamfitter would be sent to replace Novak, who was not an "A-man"; he also ordered Koster before the executive board of the union for a briefing on a foreman's duties. John also had claimed that a prefabricated boiler which was being delivered to the jobsite violated the contract.[3] Koster confirmed that a prefabricated boiler was being delivered; the agent said that he would look into the matter when the boiler arrived.

On the same day, March 26, John requested Koster to supply him with protective leather equipment and Koster agreed to do so.[4] John testified that, despite his repeated requests and Koster's repeated promises, he never received the equipment. Kleinhans testified that the requested equipment was provided, but John claimed that only one set was ever provided and that was used by Collins, the steamfitter who replaced Novak.

On March 29, the union business agent called Kleinhans and told him of the investigation and the action taken. Kleinhans asked who had made the complaints; the agent answered that it was irrelevant. Kleinhans then said that it looked like he had a couple of "troublemakers" on the job.

On March 30, Kleinhans came to the jobsite and John, with William in attendance, asked about the 8-hour job and expense money. Kleinhans said he could see no reason for it, but might consider the request later.

On Friday, April 2, Soebke paid the employees for the work through the previous Tuesday. The Landers and Collins complained that the contract required

---

2. The union's membership is divided into two branches: a construction branch made up of steamfitters, commonly referred to as "A-men," and a service branch made up of metal tradesmen or "B-men." A-men and B-men have different union books and are covered by separate collective bargaining agreements.

3. The collective bargaining agreement requires that, with certain exceptions, all piping up to and including four inches

in diameter shall be cut, threaded and have fittings screwed on either on the job or in the shop of the direct employer. The prefabricated boiler in question had piping of under four inches in diameter.

4. The contract requires the employer to furnish all necessary tools. The union business agent testified that the union considers the word "tools" to include the protective leather equipment required by steamfitters.

that they be paid through Wednesday.[5] After a discussion and a threat by John that the three of them would notify the union and would wait at the site until they received the money, Soebke agreed to bring the extra day's pay on Monday.

The prefabricated boiler arrived on April 7 and John called the union, after he found that Koster did not intend to do so, in order to have the boiler inspected. Eventually, a union business agent did discuss the matter with Kleinhans, but he found that no violation was involved.[6]

Between April 7 and April 15, the Landers, Collins and Koster moved the boiler and a refrigerator unit into place. John complained to Koster that the rollers and blocks available were not the standard equipment which should be provided for such an operation; William and Collins made similar complaints.

On Thursday, April 15, Soebke paid the Landers in full and told them they were discharged. When asked for the reason, Soebke said he had no reason but was merely carrying out orders.

On April 20, John and William filed unfair labor practice charges against respondent.

For three months, respondent avoided stating any concrete reasons for the discharges. Kleinhans, when questioned by a union agent shortly after the discharges, said he had fired the Landers for "different reasons," but declined to specify the reasons. He refused to reinstate the Landers, saying that "these guys even went to the National Labor Relations Board." Kleinhans also refused to give any reason for the discharges when subsequently questioned by a Board agent. In its answer and amended answer filed in the Board proceedings, respondent defended the discharges simply on the ground that under the contract it had the right to discharge "any person whom the employer, in its sole discretion, may deem fit."

At the hearing, Kleinhans and Soebke testified that the Landers had been taking long lunch hours and had been leaving early, and that this was the reason for the discharges.

The trial examiner accepted this testimony and found that the Landers were discharged "because of their failure to give a day's work for a day's pay." He also found that, even if the Landers were discharged for making complaints, the discharges were not discriminatory because the complaints were not for legitimate union or concerted purposes; John was the sole protagonist and the complaints were for his "own selfish benefit and aggrandizement" in that they were aimed at forcing the employer either to grant overtime and expenses or to incur the back pay award which would result from a discriminatory discharge.

The Board, with one of the three panel members dissenting, rejected the findings of the trial examiner on both points, concluding that the complaints were protected activity and that they constituted the reason for the discharges. Therefore, the Board found that respondent had engaged in an unfair labor practice in violation of Section 8(a) (1), and issued an order requiring respondent to cease and desist therefrom and to make the Landers whole for any loss of pay they may have suffered as a result of their discharges. Further, if the Tratman Avenue job has not yet been completed, respondent is required to offer the Landers reinstatement and to post appropriate notices at the jobsite. If that job has been completed, respondent is required to notify the Landers that notwithstanding their discharges they will be considered for employment on a nondiscriminatory basis at any of respondent's projects at which they may

---

5. The collective bargaining agreement provides that steamfitters shall be paid at quitting time on Friday for the week ending the Wednesday before.

6. According to respondent, a union agent called Kleinhans, after the Landers were discharged, and inquired into the matter of the boiler. When Kleinhans told him its place of manufacture, the agent approved the boiler because it had been made in a union shop.

choose to apply. The order also directs respondent to include in the letters to the Landers copies of the notice which would have been posted at the Tratman Avenue jobsite had it not been concluded and to mail copies of the notice to all its employees who were employed at the Tratman Avenue project on April 15, 1965.

■ This court must accept the Board's findings of fact if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). The trial examiner's findings are part of the record, and the fact that those findings were rejected by the Board must be considered in determining whether the "substantial evidence" test is met. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). While this requires that some weight be given to the examiner's findings, it does not mean that "an examiner's findings on veracity must not be overruled without a very substantial preponderance of the evidence as recorded," the standard formulated by Learned Hand in the Universal Camera case on remand, 190 F.2d 429, 430 (2 Cir. 1951). This relatively strict standard has been rejected by the Supreme Court in FCC v. Allentown Broadcasting Co., 349 U.S. 358, 364, 75 S.Ct. 855, 859, 99 L.Ed. 1147 (1955):

> We think this attitude goes too far. It seems to adopt for examiners of administrative agencies the "clearly erroneous" rule of the Fed.Rules Civ. Proc. 52(a), applicable to courts. In Universal Camera Corp. v. Labor Board, 340 U.S. 474, 492, [71 S.Ct. 456, 467, 95 L.Ed. 456], we said * * * "The responsibility for decision thus placed on the Board [by 29 U.S.C. § 160(c)] is wholly inconsistent with the notion that it has power to reverse an examiner's findings only when they are 'clearly erroneous.' Such a limitation would make so drastic a departure from prior administrative practice that explicitness would be required."

■ Thus the Board may reject the examiner's findings, even though they are not clearly erroneous, if the other evidence provides sufficient support for the Board's decision. But it seems that the Board's supporting evidence, in cases where it rejects the examiner's findings, must be stronger than would be required in cases where the findings are accepted, since in the former cases the supporting evidence must be deemed substantial when measured against the examiner's contrary findings as well as the opposing evidence.

While the standard set forth in Universal Camera is imprecise, "it provides as much clarity as the area affords." Bon-R Reproductions, Inc. v. NLRB, 309 F.2d 898 (2 Cir. 1962). This court must look at the facts of each case and determine whether the supporting evidence, even if not preponderating in this court's view, nevertheless provides a sufficient basis for the Board's decision. We conclude that the evidence in support of the Board's decision in the present case is sufficient to meet the "substantial evidence" test.

■ The Board determined that John Landers' complaints constituted legitimate concerted activity, rejecting the examiner's finding that John was the sole protagonist and that his complaints were for his own personal benefit. Even if it were true that John was acting for his personal benefit, it is doubtful that a selfish motive negates the protection that the Act normally gives to Section 7 rights. In any event, the finding that John's complaints about contract violations were motivated by a desire to harass his employer into granting him overtime and expense money involves a chain of inferences which the Board was not required to draw. The record provides adequate evidence, aside from the testimony of John himself, to support the Board's conclusion that the complaints were for legitimate concerted purposes.

■ Contrary to the examiner's statements that John was acting alone despite an almost complete lack of interest by his fellow employees, the testimony of William Landers, Collins, Soebke, and Kleinhans shows that on several occasions John was speaking for William and

Collins as well as for himself. Furthermore, while interest on the part of fellow employees would indicate a concerted purpose, activities involving attempts to enforce the provisions of a collective bargaining agreement may be deemed to be for concerted purposes even in the absence of such interest by fellow employees.

The examiner's conclusion that John's complaints were lacking in merit is contradicted by evidence showing that except for the requests for overtime and expenses, John's complaints were either justified or at least founded on some reasonable basis.[7] The trial examiner relied heavily on the union's "dearth of interest" in John's complaints, but the record does not support his conclusion that the union thought these complaints to be without significance. In response to John's first call, the union business agent visited the jobsite and the complaints made at that time were resolved in favor of John's position, indicating that the union found them to be meritorious. With regard to the prefabricated boiler, a union agent did follow up the complaint, although he concluded that there was in fact no violation.

■ In these circumstances, the examiner's conclusion that neither the union nor his fellow employees saw any merit in John's complaints seems unwarranted. While those complaints may have been minor, they do not appear to have been mere fabrications. As the Board's decision points out, the Board need not find the complaints to be meritorious in order to hold the activity protected, but the fact that the complaints were apparently reasonable does support the conclu-

sion that they were made for legitimate union purposes and were not fabricated for personal motives.

Furthermore, neither Kleinhans nor Soebke testified that they had seen the complaints as pressure for the 8-hour job and expense money, and the record provides no direct support for the examiner's conclusion that John made the complaints to force his employer to grant these extra benefits.

Finally, the examiner's findings were based partly on two inferences specifically rejected by the Board: that a wrongful motive may be inferred where an employee has sought a better-paying job and that a wrongful motive may be inferred where an employee has sought legal advice from a regional office of the Board.

■ In view of all these considerations, we find that despite the opposing evidence and the contrary findings of the trial examiner, the evidence in support of the Board's finding on this issue is sufficient to meet the substantial evidence test.

The Board also rejected the finding of the examiner on the motive for the discharges. The examiner accepted the testimony of Kleinhans and Soebke that the Landers were discharged because they took long lunch hours and left work early. The Board gave several reasons for reversing the examiner on this matter. First, for three months the employer evaded giving the concrete reasons allegedly responsible for the discharges; this supports the inference that the reasons subsequently advanced were not in fact the basis for the discharges. Second, the Board found

---

7. Three of the complaints—that steamfitters could not be required to work alone, that a "B-man" could not be employed as a steamfitter, and that steamfitters should be paid through Wednesday—were resolved in favor of John's position and apparently were justifiable complaints. The testimony of the union business agent indicates that if in fact the leather equipment was not provided, John's complaint on this issue may have been well founded. Testimony by William Landers and

Collins lends support to John's complaint that the blocks and rollers provided for moving the boiler were not standard equipment. It appears that the boiler itself did not violate the contract, see fn. 6 supra. However, in view of the contract provision concerning prefabricated piping and the fact that the union did inquire into the matter, it seems that John may well have acted reasonably in calling the subject to the attention of the union.

that Kleinhans' and Soebke's testimony at the hearing in support of the reasons finally stated for the discharges was not only contradictory but was at variance with statements made by each in prior affidavits. In view of these contradictions, the Board found that the testimony of Kleinhans and Soebke was not credible. Also, as the Board noted, there was ample evidence in the record showing that Kleinhans, contrary to his claim at the hearing, was aware of the Landers' complaints.

Furthermore, the examiner's decision to discredit the Landers' testimony that they did not leave early or take long lunches was based on three premises which the Board rejected. First, the examiner concluded that the Landers' testimony that they could not recall ever having left work prior to 3:15 amounted to an admission that they generally left work at least 15 minutes before the 3:30 quitting time. The Board found this inference to be unjustified. Second, the examiner found that John's denials that he left work early were not credible in the light of his other complaints; the Board correctly held that the fact that John made complaints about working conditions could not be used as a basis for finding his testimony on another matter incredible. Third, the examiner stated that Collins' testimony contradicted John's story in this regard; in fact, Collins corroborated the Landers' testimony on this issue.

For these reasons, the Board rejected the credibility findings of the trial examiner. The Board's opinion points out that the examiner's credibility findings were not based on demeanor, and that even if they were they would be rejected in view of the contradictions noted and the fact that the Board felt those findings to be unsupported by the record as a whole. The examiner does not state that his credibility findings were based on demeanor, and while they may well have been influenced by the demeanor of the witnesses, a reading of the examiner's opinion supports the conclusion that the credibility findings purport to rest mainly on an analysis of the testimony. In these circumstances, it seems that the Board may properly give the credibility findings less weight than would be required in a case where those findings were explicitly based on demeanor.

Therefore, we find that the record provides evidence sufficient to support the Board's rejection of the examiner's findings on this issue.

In addition to contesting the sufficiency of the evidence, respondent attacks the Board's jurisdiction contending that the Board is attempting to enforce a collective bargaining agreement and that the sole remedy is under Section 301 of the Act. This argument is without merit. The instant proceeding is to enforce the right of an employee to present complaints to his employer or supervisor in connection with the employer's violations of the agreement, not to enforce the agreement itself. And the mere fact that an employer has submitted to collective bargaining and entered into a contract with the union does not oust the Board of jurisdiction to find unfair labor practices. NLRB v. M & M Oldsmobile, Inc., 377 F.2d 712 (2 Cir. 1967).

Enforcement granted.