ONTARIO KNIFE COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 68, 123, Docket 80–4039, 80–4073.

United States Court of Appeals,
Second Circuit.

Argued Sept. 17, 1980.

Decided Dec. 22, 1980.

John B. Drenning, Buffalo, N. Y. (Moot, Sprague, Marcy, Landy, Fernbach & Smythe, Buffalo, N. Y.), for petitioner.

William Wachter, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C.), for respondent.

Before WATERMAN, FRIENDLY and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

This petition by Ontario Knife Company (Ontario) to review and cross-petition by

---

the National Labor Relations Board (NLRB or the Board) to enforce an order, 247 NLRB No. 168 (1980), which had found Ontario guilty of violating § 8(a)(1) of the National Labor Relations Act (the Act) by discharging and refusing to reinstate employee Angel Cobado, raises a close question, of first impression in this Circuit, with respect to the application of § 8(a)(1) to the discharge of a single employee of a non-union plant for walking off the job after protesting a condition of employment.

### THE FACTS

The facts, concerning which there is no dispute save as to inconsequential details, are stated at length in the decision of the ALJ and more summarily in that of the Board. Ontario is a knife manufacturer, employing some 300 persons and operating a day and a night shift. At the time here in question Frank J. Warren was plant manager, Robert E. Hall was personnel manager and Rolla Peterson, Jr. was night foreman. Peterson was assisted by leadman Frank Cornelius. The ALJ found, and counsel for the Board does not dispute, that Warren was responsible for production control and scheduling; that night shift production schedules were "usually determined by day shift foremen in a production continuity sense"; and that Peterson had "no authority to change a production schedule, except for a required exercise of judgment in the case of a machine breakdown or depletion of parts." The plant was non-union.

Angel Cobado was hired in 1976 as a riveter, assigned to the second shift (3:30 P.M. to midnight), where she worked with two other employees, Ethel Briggs and Judy Swift. Their basic work was to rivet wood or plastic handles to knives. Continuing difficulties had been encountered in the riveting of handles to machetes. These difficulties adversely affected additional incentive pay. Also the work was dirtier than on other knives because in the six

months preceding the incident here at issue the machete blades had been dipped in oil, apparently to retard rusting.

Cobado testified that she and Swift had been complaining for a long time over what they considered to be an excessive assignment of machete work to the night shift. The ALJ found that she had reported the problem "to Leadman Cornelius, to Foreman Peterson, to Plant Manager Warren, and to whomever would listen to her." She admitted that Warren had been generally accessible to her for these complaints as well as complaints on other matters. She also conceded that Warren had taken some steps to deal with the incentive pay problem and had placed riveting employees on rotation assignment with respect to machete production. By the time of the incident here at issue, June 22, 1978, Cobado's grievance had become limited to a claim that the burden of machete work was unfairly distributed between the day and the night shifts. Although her recollection that day shift operators had not worked on machetes in May or June, 1978, proved to be grossly in error,[1] unequal distribution did begin in late May. In particular, no first shift operator had worked on machetes on June 20 when Cobado did, on June 21 when Swift did, or on June 22 when Briggs was to do so. Warren explained this imbalance as arising from the fact that since Ontario was behind schedule in its machete deliveries and blades, handles and special rivets often did not arrive until the afternoon, the night shift was obligated to start the work to get the production out.

On arriving for work on Thursday, June 22, Cobado looked at the day foreman's desk for the night shift instructions and found that machetes were on the list. It was Briggs' turn to do that work that night, with Cobado's to come the next night if machetes should again be scheduled. On the previous day she had complained to Cornelius, although not to Peterson or Warren, about the unequal distribution of the

1. On the 10 days in May when machetes were produced, the first shift had worked on ma- chetes on 6 and the second shift on 8.

machete work as between day and night shifts. While she and Swift were complaining to each other on the afternoon of June 22,[2] Cornelius came through their department and Cobado asked him what he had found out in the office about her complaint of the previous day. Cornelius reported to Peterson that, as said by the ALJ, "Cabado [sic] and Swift were upstairs bitching about the machines and doing the machetes." Peterson came upstairs, took Cobado and Swift into another room and asked Swift what the problem was. When she answered that Cornelius was supposed to find out from someone why they were doing machetes when the day crew had not done any, Peterson replied that Cornelius had no reason to go to the front office since he (Peterson) was the boss and it was his place to go. After more discussion, the two employees said that the next time it was their turn to work on machetes, they were going to refuse. Peterson responded that the employees were bound to do whatever work was described on the day foreman's list, and that if they didn't like the type of work so described, they should get out and the employer would find other people. According to Cobado, Peterson, looking at her, said, "If there is a thing on there [the day foreman's list] that says you have to kiss my ass, that is what you are going to do." Cobado retorted, "I don't need this garbage", walked to her machine, shut it down, packed her belongings, and walked off the job, punching out and crying as she left.[3]

Peterson and Cornelius then went to the office in order to report the incident to Warren. Not finding him there, Peterson contacted Hall. The evidence as to what passed between them is inconclusive. The next day Cobado telephoned Hall, told him her story and asked if she was to come to work that evening, saying she had been a fool to walk off the job. Hall replied that

he didn't know and asked why she had walked off the job; she answered, in somewhat more colorful language, that she was angry and "would have had to start swinging or doing something." Claiming it was her "nerves" that had caused her to become angry, she offered to get a doctor's slip. Hall advised against this and said he would have to discuss the matter with Warren. On Monday, June 26, Hall phoned Cobado to tell her that she was being terminated for walking off the job. Warren took responsibility for the decision. He stated that he relied in part on previous absences by and warnings to Cobado, but the ALJ was justified in concluding that the June 22 incident was the precipitating factor.

### The Decisions of the ALJ and of the Board

The complaint alleged that Ontario's discharge and refusal to reinstate Cobado violated § 8(a)(1) which makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." That section, so far as here relevant, gives employees the right "to engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection...." The ALJ had little difficulty in concluding that Cobado and Swift in registering their complaints with management over the alleged discrimination against the second shift in the recent assignment of machete work were engaged in a "concerted activity" for the purpose of "mutual aid or protection." Citing, inter alia, NLRB v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962), he thought it to be "established beyond peradventure that a concerted walkout of employees to protest job conditions is activity protected by the Act"; that a concerted threat to do so must likewise be; and that if Cobado and

**2.** There is no evidence that Briggs ever joined in the complaints.

**3.** In a letter dated July 2, 1978, to the Board's regional office, Cobado's version of the incident was somewhat different, leaving it doubtful whether the vulgar phrase was Peterson's or her own. Peterson acknowledged telling the

two employees that if they did not want to do the work, they would have to go home and he would hire somebody to replace them; that Cobado said she was going home; and that he answered, "You better have a good reason for leaving."

Swift had both walked out in protest and been fired for doing so, Ontario should be found to have violated § 8(a)(1). He then addressed himself to what he characterized as "the rub", namely, that only Cobado had walked off. On this he ruled against the General Counsel, concluding "that Cobado's departure was a spur-of-the-moment decision, certainly understandable, but no less evident as being the subjective reaction of [an] individual; in short, a personal action, and thus not a concerted activity."

A three-member panel of the Board took a different view on the latter point. It relied on its decision in *Steere Dairy, Inc.*, 237 NLRB No. 219 (1978), holding that "a single employee's walkout to protest a change in terms and conditions of employment for all employees was protected concerted activity despite the refusal of other employees to join in." Stating that "Cobado and Swift were engaged in group action up to the point when Cobado walked out alone", the Board stated, without explanation, that "[i]t follows, a fortiori, that Cobado's individual protest was protected because it involved a group concern—the work of all second-shift employees." Accordingly it found that Ontario had violated § 8(a)(1) by discharging Cobado and entered an order which, in addition to usual cease and desist and notice provisions, required Ontario to offer Cobado reinstatement to her former position and back pay.

## DISCUSSION

The courts have not found it easy to apply the provision of § 7 conferring the right "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection" to cases such as this. One reason is that, in framing § 7, Congress scarcely had the problem in mind. The term "concerted activities" had a history in labor law considerably antedating enactment of the NLRA. Section 7 stems from § 2 of the Norris-LaGuardia

Act, 47 Stat. 70 (1932), which stated in its declaration of public policy that "it is necessary that [the individual unorganized worker] shall be free from the interference, restraint or coercion of employers . . . in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." The chief objective of that Act was to curtail injunctions sought by an employee or by the Government against what everyone would recognize as organized activity, notably picketing in order to promote unionization or union demands. See Frankfurter and Greene, The Labor Injunction (1930). And see generally *UAW v. Wisconsin Employment Relations Board*, 336 U.S. 245, 257–58, 69 S.Ct. 516, 523–24, 93 L.Ed. 651 (1949), and Note, The Requirement of "Concerted" Action Under the NLRA, 53 Colum.L.Rev. 514, 514–15 (1953). We recount this history not at all with a view to challenging the long settled principle that § 7 covers concerted activities by nonunionized employees for the purpose of mutual aid or protection, see *NLRB v. Washington Aluminum Co., supra,* but rather to suggest that in dealing with a situation such as that here presented, courts should adhere rather closely to the statutory text.[4]

We accept that if, on reporting for work on June 23, Cobado had found herself assigned to machete work although the day shift had done none, she and Swift had walked out together in protest, and then had thought better of their action and had sought to return when no replacements had yet been hired, a refusal by Ontario to take them back would have constituted an unfair labor practice, even though it had legitimate business reasons for assigning machete work predominately to the night shift. In such a case the activities would have been both "concerted" and for "mutual aid or protection" and a discharge under the circumstances would impair their effective exercise. However, that was not what

4. Indeed, Congress has admonished the courts and the Board generally to be faithful to the text of the statute. The Senate Report accompanying the NLRA states that the "bill is specific in its terms. Neither the National Labor Relations Board nor the courts are given any blanket authority to prohibit whatever labor practices that in their judgment are deemed to be unfair." Sen.Rep.No.573, 74th Cong., 1st Sess. 8 (1935).

occurred. Although Swift shared Cobado's objections to the machete work, thereby meeting the "mutual aid or protection" requirement of § 7, she did not join Cobado in walking off the job on October 22 and there was thus no "concerted activity."

The Board argues that the requirements of § 7 were nevertheless satisfied under the decisions of the Supreme Court in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975) and the companion case of *ILGWU v. Quality Manufacturing Co.*, 420 U.S. 276, 95 S.Ct. 972, 43 L.Ed.2d 189 (1975) and this court's decision in *NLRB v. Interboro Contractors, Inc.*, 388 F.2d 495 (2 Cir. 1967), which we followed in *NLRB v. Langenbacher Co.*, 398 F.2d 459, 463 (2 Cir. 1968), *cert. denied*, 393 U.S. 1049, 89 S.Ct. 685, 21 L.Ed.2d 691 (1969), and *American Telephone & Telegraph Co. v. NLRB*, 521 F.2d 1159, 1161–62 (2 Cir. 1975). We do not regard these decisions as apposite.

The *Weingarten* and *Quality Manufacturing* decisions dealt with a problem quite different from the one presented here. Both cases concerned the refusal of a request for a single union employee to have the assistance of a union representative in an interview with the employer that could have led to discipline or discharge and also, in *Quality Manufacturing*, the insistence of others in furnishing it.[5] The issue in these cases was not the requirement of concertedness, but the requirement that the activities be for "mutual aid or protection." The cornerstone of the two decisions was the statement in *Weingarten* that although "the employee alone may have an immediate stake in the outcome ... [t]he union representative whose participation he seeks is ... safeguarding not only the particular employee's interest, but also the interests of the entire bargaining unit by exercising vigilance to make certain that the employer does not initiate or continue a practice of imposing punishment unjustly" and that "[t]he representative's presence is an assur-

ance to other employees in the bargaining unit that they, too, can obtain his aid and protection if called upon to attend a like interview." 420 U.S. at 260–61, 95 S.Ct. at 965–66. That the *Weingarten* decision deals only with the question of what activities are properly for "mutual aid or protection" was made clear by the Court's approving quotation, 420 U.S. at 261, 95 S.Ct. at 965, of our opinion in *NLRB v. Peter Cailler Kohler Swiss Chocolates Co.*, 130 F.2d 503, 505–06 (2 Cir. 1942), that:

> When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they engage in a 'concerted activity' for 'mutual aid or protection,' although the aggrieved workman is the only one of them who has any immediate stake in the outcome. The rest know that by their action each of them assures himself, in case his turn ever comes, of the support of the one whom they are all then helping; and the solidarity so established is 'mutual aid' in the most literal sense, as nobody doubts.

by its further decision, 420 U.S. at 261–62, 95 S.Ct. at 965–66, of the declared purpose of the Act, 29 U.S.C. § 151, "to protect 'the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of ... mutual aid or protection'", and by its conclusion that the "right to the presence of a union representative at an investigatory interview in which the risk of discipline reasonably inheres is within the protective ambit of the section ...." 420 U.S. at 262, 95 S.Ct. at 966.

Implicit, of course, in the Court's decision in *Weingarten* is that the action of an individual in requesting the assistance of a union steward met § 7's requirement of concertedness as well. While by definition, an individual acting alone cannot act in concert, § 7 is not limited to concerted activity per se. Instead, it protects the "right to

---

5. *Weingarten* held that refusal of a request for such assistance was an unfair labor practice. *Quality Manufacturing* held that discharge or suspension because of one employee's demand-

ing assistance and other employees insisting on furnishing it constituted an unfair labor practice.

engage in ... concerted activities." If workers have the right to engage in concerted activities and to associate freely, then, as the Third Circuit recognized in *Mushroom Transportation Co. v. NLRB*, 330 F.2d 683 (3 Cir. 1964), employers cannot obstruct an employee's efforts to exercise those rights. Individual activity can be protected, therefore, if it is "looking toward group action." *Mushroom Transportation*, 330 F.2d at 685. That, however, was not the situation here.

*Interboro* provides no more authority for the Board's position than does *Weingarten*. In *Interboro*, two employees were discharged and the court found that the more vocal one was speaking on behalf of two others, 388 F.2d at 499–500. However, the opinion went on to say, *id.*:

> Furthermore, while interest on the part of fellow employees would indicate a concerted purpose, activities involving attempts to enforce the provisions of a collective bargaining agreement may be deemed to be for concerted purposes even in the absence of such interest by fellow employees.

This statement has met with a mixed reception. The Board and several courts have adopted the doctrine. See *Roadway Express, Inc. v. N. L. R. B.*, 217 NLRB No. 278 (1975), enf'd, 532 F.2d 751 (4 Cir. 1976); *NLRB v. Ben Pekin Corp.*, 452 F.2d 205, 206 (7 Cir. 1971); *NLRB v. Selwyn Shoe Mfg. Corp.*, 428 F.2d 217, 221 (8 Cir. 1970). Several circuits have expressly disapproved it. See *Aro, Inc. v. NLRB*, 596 F.2d 713, 717–18 (6 Cir. 1979); *NLRB v. Buddies Supermarkets, Inc.*, 481 F.2d 714, 719 (5 Cir. 1973) (alternative holding); *NLRB v. Northern Metal Co.*, 440 F.2d 881, 884 (3 Cir. 1971). Other courts have limited the effect of the dictum to situations where as in *Interboro* and our cases following it an employee was asserting rights under a collective bargaining agreement. See *NLRB v. Bighorn Beverage*, 614 F.2d 1238, 1242 (9 Cir. 1980);

*NLRB v. Dawson Cabinet Co.*, 566 F.2d 1079, 1083 (8 Cir. 1977); *NLRB v. Buddies Supermarkets, Inc., supra*, 481 F.2d at 719 (5 Cir. 1973) (alternative holding); *Illinois Ruan Transport Corp. v. NLRB*, 404 F.2d 274, 289–90 (8 Cir. 1968) (Lay, J., dissenting). Finally, the Board, in *Steere Dairy, Inc., supra*, at 1350, has extended the *Interboro* dictum beyond "constructive" concerted activities, i. e., situations in which an individual employee is attempting to enforce a collective bargaining agreement which is itself the result of concerted activity, to any case in which a cause advanced by an individual would redound to the benefit of his fellow employees. See *Randolph Division, Ethan Allen, Inc. v. NLRB*, 513 F.2d 706, 708–09 (1 Cir. 1975); *Keokuk Gas Service Co. v. NLRB*, 580 F.2d 328, 333 (8 Cir. 1978); *NLRB v. Sencore, Inc.*, 558 F.2d 433, 434 (8 Cir. 1977) (per curiam). The Board's doctrine of "constructive concerted activity" has recently been rejected by Judge Edwards, writing for the District of Columbia Circuit, in *Kohls v. NLRB*, 104 LRMM 3049 (1980)—a case quite similar to ours on its facts.

We think that, except in the context of agreements between an employer and his employees which are themselves the product of concerted activities, as in *Interboro* § 7, for reasons indicated above, should be read according to its terms. Not only must the ultimate objective be "mutual" but the activity must be "concerted" or, if taken by an individual as in *Weingarten*, must be looking toward group action. The Board did not and could not reasonably find that Cobado was discharged for making the protest in which Swift joined; she was discharged and refused reinstatement because she walked off her job.[6] There was no evidence that Swift participated in or approved Cobado's impulsive and, as she later admitted, foolish action; Swift went on with her work, being willing to wait and see what Ontario would do.[7] While Cobado

---

6. The ALJ found that Cobado "was discharged essentially because she walked off the job after a discourse disagreement with her supervisor", and the Board adopted this finding.

7. It bears repeating that neither Cobado nor Swift was assigned to work on machetes on June 22 and that to the employees' knowledge no response to Cobado's protest could have

was doubtless speaking for Swift in the initial protest, see *Jim Causley Pontiac v. NLRB,* 620 F.2d 122 (6 Cir. 1980), she was not doing so in the act that led to her discharge. It is of no moment that Peterson unnecessarily employed vulgar language; the Board and the courts have recognized that the speech of the workplace is not that of the parlor, as Cobado herself demonstrated in her talk the next day with Warren, and no one could have taken it literally. See *Old Dominion Branch No. 496, National Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781–82, 41 L.Ed.2d 745 (1974).

The petition for review is granted and the cross-petition for enforcement is denied.

been made by Peterson. Peterson had no authority to alter the work schedule and Warren

was unavailable until June 23.