ROADWAY EXPRESS, INC., Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.

Saint E. BELL, Jr., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 81–7831, 81–7902.

United States Court of Appeals, Eleventh Circuit.

March 17, 1983.

Rehearing and Rehearing En Banc Denied May 20, 1983.

Fisher & Phillips, Michael C. Towers, Mark E. Edwards, Atlanta, Ga., for petitioner.

Saint E. Bell, Jr., petitioner, pro se.

Joseph A. Oertel, N.L.R.B., Washington, D.C., for respondent.

Before HENDERSON and HATCHETT, Circuit Judges, and TUTTLE, Senior Circuit Judge.

HATCHETT, Circuit Judge:

The National Labor Relations Board (Board) asks the court to follow *NLRB v. Interboro Contractor's Inc.,* 388 F.2d 495 (2d Cir.1967) and hold that an employee acting alone engages in "concerted activities" when he asserts a right created by a collective bargaining agreement. Adhering to Fifth Circuit precedent, we reject the Board's request. The Board's order is enforced in part.

**1.** Roadway Express and Local # 728 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers are parties to a collective bargaining agreement that authorizes employees to appeal warning letters by written notice within ten days of the warning. National Master Freight Agreement and

## I. Facts

These cases arose when three employees filed charges with the Board alleging that Roadway Express, Inc., (Roadway) unlawfully interfered with, restrained, and coerced the exercise of rights protected by section 7 of the National Labor Relations Act (Act), 29 U.S.C.A. § 157. Roadway allegedly interfered with the exercise of rights by issuing disciplinary warning letters to two employees and by suspending and ultimately discharging another. The administrative law judge's (ALJ) factual findings are as follows.

*Albert T. Wilson*

Albert T. Wilson is a dockworker employed at Roadway's Atlanta, Georgia, terminal. In early September, 1979, Wilson's supervisor mistakenly issued a warning letter to Wilson for mishandling freight. Wilson complained to the assistant terminal manager, Sammy Harmon, who agreed to investigate.[1] On September 6, 1979, when Wilson asked Harmon whether the warning letter had been expunged, Harmon told Wilson either that he had taken care of the letter or that he would take care of it. Unsatisfied with this response, Wilson contacted union steward John Ellis. On September 7, 1979, Wilson and Ellis went to see superintendent Al Southern seeking permission to examine Wilson's personnel file. Southern refused and instructed Wilson and Ellis to continue checking with Harmon. Because Harmon was not at work that morning, Wilson and Ellis went to terminal manager Carlton Shephard who eventually instructed Southern to let Wilson examine his file. Complying with these instructions, Southern showed Wilson and Ellis a list of Wilson's current warning letters. The list did not include the erroneous letter regarding mishandling of freight. Satisfied that the erroneous letter had been expunged, Wilson returned to work.

Southern Conference Area Over-the-Road Supplemental Agreement, Art. 45, § 1. By Roadway Express's established policy, if an employee fails to appeal a warning letter, he forfeits the right to subsequently challenge the warning should the company later base additional disciplinary action on the unchallenged warning.

Shortly thereafter, Southern contacted Harmon to inquire about the erroneous letter. Harmon told Southern that he informed Wilson on September 6, 1979, that the warning letter had been "taken care of." Southern then asked Wilson whether Harmon had said that he had taken care of the warning letter. Wilson replied "Yes." Southern then issued Wilson a warning letter for wasting approximately ten to fifteen minutes pursuing a grievance with management officials after being assured that it had been resolved. Wilson's charges filed with the Board resulted in the issuance of a complaint alleging that Roadway Express violated section 8(a)(1) of the Act, 29 U.S.C.A. § 158(a)(1),[2] by issuing the second warning letter.

*William J. Howard*

On November 23, 1979, Howard was scheduled to drive a truck from Atlanta, Georgia, to Memphis, Tennessee. After inspecting the vehicle assigned to him, Howard reported that the brake shoe on one axle protruded from the hub and when the parking brake and foot brake were applied simultaneously, air leaked from the brake system.[3] Howard reported the perceived

**2.** Section 8(a)(1) of the Act states that "[i]t shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of rights guaranteed [by section 7 of the Act]." 29 U.S.C.A. § 158(a)(1). Section 7 provides, in pertinent part, that:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment . . . .

29 U.S.C.A. § 157.

**3.** Federal Highway Administration regulations require drivers to inspect their assigned vehicle's service brakes, including trailer brake connections. *See* 49 C.F.R. § 392.7 (1981). The collective bargaining agreement provides in part:

> [E]mployees shall immediately, or at the end of their shift, report all defects of equipment. . . . The employer shall not ask or require any employee to take out equipment

defect to garage manager W.E. Hartley. After inspecting the vehicle, Hartley told Howard that the vehicle was safe to operate. Hartley also told Howard that if he insisted upon a mechanic's inspection and no defects were revealed, the company would enforce its policy of issuing a warning letter for unnecessarily delaying freight.[4] Howard insisted on a mechanic's inspection. The mechanic assigned by Hartley to examine the vehicle found no defects; as a result, Howard's supervisor issued a warning letter for negligence. Like Wilson, Howard's charges filed with the Board resulted in a complaint alleging that the warning letter's issuance violated section 8(a)(1) of the Act, 29 U.S.C.A. § 158(a)(1).

*Saint E. Bell, Jr.*

An employee with Roadway since 1962, Saint Bell worked as a forklift operator in Roadway's Atlanta terminal until his discharge on April 9, 1980. Between 1962 and 1980, Bell received over fifty warning letters for such offenses as tardiness, wasting time, insubordination, and failing to follow instructions. Characterized as an *enfant*

> that has been reported by any other employee as being in an unsafe operating condition until same has been approved as being safe by the mechanical departments.

Art. 16, § 4.

**4.** Roadway Express has an established working rule correlating to the procedures of the collective bargaining agreement set out in footnote 3. By this company rule, if a driver perceives a defect in the unit assigned to him, he takes the vehicle to the garage foreman for inspection. If the garage foreman agrees with the driver's report, a mechanic is assigned to repair the vehicle. If the garage foreman discovers no defects, he informs the driver who then can either accept the garage foreman's opinion and continue on his trip, or insist that a mechanic, a union member, inspect the vehicle. If the driver insists upon a mechanic and no defect is discovered, the driver will receive a warning letter for delaying freight and incurring unnecessary expenses. Vehicles are inspected by mechanics prior to assignment to insure roadworthiness. The ALJ found that the local union did not object to this policy, but reserved the right to consider each case on its merits in the event that enforcement resulted in a driver's suspension or discharge.

*terrible* by the ALJ, Bell was also suspended during this period for failing to follow instructions. In response to numerous charges filed by Bell from October, 1979, to April, 1980, the Board issued four complaints challenging seven disciplinary measures as unfair labor practices.

1. On May 8, 1979, Bell complained to dock foreman Roy Wood that his forklift was smoking and requested another lift. After Wood told Bell to find another lift, Bell stated that it was not his responsibility to find another lift, and asked for a union steward. Wood told Bell that a steward would not be available until after lunch and instructed him to continue driving the smoking lift until the steward returned. Bell replied that he did not care whether the steward came or not, and that he would "get [Wood's] ass." Wood wrote up the incident in a warning letter for insubordination.

2. On July 26, 1979, Bell received a warning letter for taking an excessive restroom break. In a meeting with terminal manager William Young and union steward James Long, Young stated that Bell had spent thirty-two minutes in the restroom, and such an excessive break had cost the company five dollars. The ALJ found that Roadway's employees were aware of Roadway's policy against wasting time and found it irrelevant that the policy was not so specific as to place time limits on restroom breaks.

3. Bell also claimed as an unfair labor practice Roadway's refusal to pay overtime for time spent discussing a grievance and the issuing of a warning letter for insubordination on August 28, 1979. On that date, Bell was assigned to repackage damaged freight. Upon finishing this assignment, Bell argued that, pursuant to company policy, an employee less senior than Bell should have been assigned to repackage the damaged freight. Bell requested dock foreman Wood to call a union steward. Finding none available, Wood refused Bell's request to contact a steward at home. In the course of the conversation, Bell told Wood that Wood thought he was God and Bell

was going to show Wood that he was not God, and that Bell "was going to have papers for [Wood's] ass." Later that day, Bell and a union steward were called to the office of terminal manager Young. Young told Bell that he had been disrespectful to Wood and would receive a warning letter for insubordination. This discussion between Bell, the union steward, and Young lasted until shortly after 9 a.m. or one-half hour after Bell's regular shift. Contrary to a discussion held after his shift on a previous occasion, Bell did not receive overtime pay for the August 28, 1979, grievance discussion. The ALJ found that it was contrary to Roadway's policy to pay overtime while discussing grievances. Time so spent is payable only if it occurs during the employee's normal eight-hour shift.

The remaining disciplinary actions concern Bell's preoccupation with the operation of Roadway's forklifts. The forklifts are designed to move freight by positioning two blades under freight. The blades attach to a carriage and can be adjusted by the forklift operator to accommodate different loads and widths. The blades are installed through a center opening on the carriage. Pins secure the blades in slots spaced at varying intervals along the carriage.

Bell's concern arose after the blades on a lift he was operating came out of the slots on the carriage. In his attempt to reposition the blades properly, Bell injured his fingers. After recuperating, Bell began reporting forklifts with regularity because the blades would not stay in place. Although management officials assured Bell that the lifts were safe, he continued to complain. The terminal manager, Al Harrelson, explained to Bell that, without freight, the blades on all forklifts would slide if kicked at the bottom. With freight added, however, Harrelson explained that the weight would hold the pins in position and would prevent movement of the blades. Unpersuaded, Bell maintained that the forklifts were unsafe if the blades moved whenever the pins were in place.

4. On January 2, 1980, Bell deadlined two forklifts for lack of pins and inade-

quate locking. The dock foreman, Rocky Allen Davis, assigned Bell to another forklift, which at the time, was operated by employee Reeves. Davis reassigned Reeves to one of the units deadlined by Bell. Bell argued with Davis for reassigning Reeves to the deadlined forklift, complaining that, such action was contrary to Roadway's policy of safety environment. Bell continued by claiming that he could sue the supervisors because they were on profit sharing. When Davis told Bell to keep quiet, Bell responded that it was "just tough shit" and that he could say anything he wanted to. Citing Bell's disrespect, Davis issued a warning letter for insubordination.

5. On March 4, 1980, Bell reported that the pins on his assigned forklift did not secure the blades properly. Davis checked the forklift, found that the pins locked properly, and instructed Bell to continue transferring freight. Bell refused. The forklift was then inspected by Harrelson who found the unit safe and instructed Bell to go to work. Assistant terminal manager Sammy Harmon arrived on the scene, explained to Bell why the forklift was safe, and told him to go to work. Bell again refused. At that point, Harmon discharged Bell.

On the following day, the forklift was inspected by a Roadway mechanic. The mechanic stated that he would not drive the forklift because the slots cradling the blades were worn and the blades were loose. In view of the mechanic's doubts as to the forklift's safety, management officials reconsidered their action and reduced the discharge to a three-day suspension for wasting time. That same day, Roadway officials called in representatives from Datsun and Clark, manufacturers of the forklifts. After initial uncertainty, the representatives concluded that Datsun and Clark blades were interchangeable on forklift cartridges and the pins which secure the blades were for the driver's convenience, and not a safety item.

6. On April 1, 1980, dock foreman Davis assigned Bell forklift # 3115. Bell reported that the blades on forklift # 3115 were insecure. Davis told Bell that he could either change the blades or drive another available forklift. Bell checked out another unit but instead of using it, he wrote a report on the perceived defects of unit # 3115. Davis summoned Harrelson who told Bell that # 3115 was not assigned to him, that the next driver could write up any possible defects, and that he (Harrelson) would have the forklift checked out. After repeated refusals, Bell finally started to work. Later the same day, Harrelson discharged Bell for refusing to follow instructions. Roadway officials subsequently reduced the discharge to a three-day suspension because Bell had not actually refused any order and his conduct was not so egregious to warrant discharging an eighteen year employee.

7. Between March 20, 1980, and April 7, 1980, forklift # 3102 was reported defective on five occasions, four times by Bell. On April 8, 1980, a mechanic inspected # 3102, found that the pins held the blades securely in place, and authorized it for service. When Bell reported for work that day and was assigned # 3102, he immediately wrote a report stating that the pins would not secure the blades. Dock foreman Rickey Beasley read the report and told Bell that the forklift had been examined by the garage and found safe. After conferring with terminal manager Joe Bass, who again told Bell that the garage found the forklift safe, Bell still refused to operate the lift. Beasley informed Bell that continued refusal would warrant disciplinary action. After conferring with a union steward, Bell again told Bass that the forklift was unsafe and refused to operate it. Bass then discharged Bell.

Immediately after the discharge, Bass asked another mechanic to inspect # 3102 again. The mechanic operated the lift, found both pins were securing the blades, and discovered no safety defects.

## II. Administrative Law Judge's Rulings

The ALJ concluded that when Wilson pursued his grievance and Howard insisted that a mechanic inspect his vehicle, they

were attempting to enforce rights created by the collective bargaining agreements. Relying upon *NLRB v. Interboro Contractor's, Inc.,* 388 F.2d 495 (2d Cir.1967), the ALJ held that Wilson and Howard were engaged in protected concerted activities within the meaning of section 7 of the Act, 29 U.S.C.A. § 157, and that Roadway Express violated section 8(a)(1) of the Act, 29 U.S.C.A. § 158(a)(1) by issuing warning letters. The ALJ ordered Roadway Express to rescind and expunge the letters.

Regarding Bell, the ALJ determined that the General Counsel failed to establish that Roadway committed any of the unfair labor practices alleged, and recommended that all complaints concerning Bell be dismissed. The ALJ found that Bell's disrespectful behavior resulting in disciplinary action for insubordination and wasting time was not protected under the Act. The ALJ further found no evidence to refute Roadway's position that it was contrary to its policy to pay overtime for time spent discussing grievances. As for the suspensions and ultimate discharge, the ALJ determined that Bell's conduct would be protected concerted activity if he in good faith refused to operate the forklifts. The ALJ concluded, however, that Bell's uncompromising and uncooperative attitude indicated a lack of good faith and not a true concern for safety.

In both cases, the Board agreed with the findings and rulings of the ALJ and adopted his recommended order.

### III. Discussion

■ In reviewing orders of the National Labor Relations Board, we are bound by the Board's factual findings if supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Weather Tamer, Inc. v. NLRB,* 676 F.2d 483, 487 (11th Cir.1982). Similarly, we must accept the credibility choices of the ALJ unless his choices are self-contradictory. *NLRB v. Florida Medical Center, Inc.,* 576 F.2d 666, 671 (5th Cir.1978). After examining the record, we find substantial support for the Board's findings regarding Bell's warning letters for insubordination, wasting time, and for Roadway Express's refusal to pay overtime while discussing a grievance.

■ Bell's remarks to supervisor Wood on May 8, 1979, can be interpreted only as contemptuous behavior toward management. Courts have recognized that abusive language often accompanies grievance discussions, and, in some instances, have found such language protected under section 7. *See, e.g., Crown Central Petroleum Corp. v. NLRB,* 430 F.2d 724 (5th Cir.1970); *NLRB v. Thor Power Tool Co.,* 351 F.2d 584 (7th Cir.1965). These decisions are of no avail to Bell, however, because his remarks were not made in the context of grievance discussions, but were entirely unprovoked. As such, they are not protected. We agree with the Board that the May 8, 1979, warning letter did not interfere with, restrain, or coerce Bell's right to engage in concerted activity.

■ We also find no error in the Board's determination that Roadway did not violate sections 8(a)(1), (3) and (4) of the Act, 29 U.S.C.A. § 158(a)(1), (3), and (4)[5] by issuing warning letters to Bell on July 26, and August 28, 1979. The record contains no evidence to refute Roadway officials' testimony that a thirty-two minute break was excessive. No employer would condone such practice by his employees without some sort of reprimand. The record also fails to support the allegation that Roadway discriminated against Bell because of his union membership, or because he filed charges against Roadway, or because he was scheduled to testify at a Board hearing. Without more, these circumstances fail to support a conclusion that the warning letter of July 26, 1979, was issued for pretextual reasons.

---

**5.** Section 8(a)(3) of the Act provides in part that "[i]t shall be an unfair labor practice for an employer ... by discrimination in regard to hire or tenure of employment to encourage or discourage membership in any labor organization ...." 29 U.S.C.A. § 158(a)(3). It is also an unfair labor practice "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony ...." 29 U.S.C.A. § 158(a)(4).

■ Finally, we find no error in the Board's ruling concerning failure to pay overtime while discussing grievances. Roadway officials' unrefuted testimony indicates that it was not company policy to pay employees for time spent discussing a grievance if occurring beyond the eight-hour shift. That Roadway Express mistakenly paid Bell on a previous occasion for discussing a grievance after his regular shift does not disprove the existence of the company policy. In any event, the failure to pay overtime while discussing a grievance is no indication that Roadway sought to discriminate against Bell for filing charges with the Board.

The circumstances of Howard's and Wilson's warning letters, and the suspensions and discharge of Bell provide the setting for the parties' major disagreement in this case. In each instance of disciplinary action, Howard, Wilson, and Bell were asserting rights found in the collective bargaining agreement. The disagreement centers on whether the assertion of such rights by an individual employee constitutes concerted activity protected by section 7. According to the Board, an employee acting alone engages in concerted activities when he in good faith attempts to enforce rights created by the collective bargaining agreement.[6] *NLRB v. Interboro Contractor's Inc.,* 388 F.2d 495, 500 (2d Cir.1967). Under the *Interboro* doctrine, a single employee's "activities involving attempts to enforce the provisions of a collective bargaining contract may be deemed to be for concerted purposes even in the absence of such interest by fellow employees." 388 F.2d at 500.[7]

Roadway Express urges us to interpret "concerted activities" more literally and

find that an employee's conduct can be considered concerted only where his actions initiate, induce, or prepare for group action. *See, e.g., NLRB v. Datapoint Corp.,* 642 F.2d 123 (5th Cir.1981); *Mushroom Transport Co. v. NLRB,* 330 F.2d 683 (3d Cir. 1964). Because Wilson, Howard, and Bell only attempted to benefit themselves and never intended to induce or initiate group action, Roadway argues that their individual actions cannot be deemed concerted.

Despite the *Interboro* doctrine's acceptance by several circuits,[8] we are bound by the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc). That court had the opportunity to adopt the *Interboro* doctrine in *NLRB v. Buddies Supermarkets, Inc.,* 481 F.2d 714 (5th Cir.1973), but declined to do so. In *Buddies Supermarkets,* employee Smith was discharged for causing dissention among his co-workers after failing to gain a more favorable contract for himself. The ALJ held that the employee was discharged for engaging in section 7 protected concerted activity, and the Board affirmed. The Board sought to bring the case within the parameters of *Interboro,* reasoning that Smith was the most vocal in presenting his views to company officials and that his attempt to gain better contractual terms for himself was intended to arouse some form of group action within the meaning of *Mushroom Transportation Co. v. NLRB,* 330 F.2d 683 (3d Cir.1964).

The Fifth Circuit rejected the Board's reasoning and questioned the validity of the *Interboro* doctrine. The court stated:

for other employees as well. The language from the decision quoted in the text above, however, is broad enough to cover situations where only a single employee asserts rights authorized through collective bargaining.

**8.** *See Roadway Express, Inc.,* 217 N.L.R.B. 278 (1975), enf'd, 532 F.2d 751 (4th Cir.1976); *NLRB v. Ben Pekin Corp.,* 452 F.2d 205 (7th Cir.1971); *NLRB v. Selwyn Shoe Mfg. Corp.,* 428 F.2d 217 (8th Cir.1970).

**6.** The Board seeks enforcement of Bell's discharge because of the ALJ's finding of a lack of good faith in his persistent complaints about company equipment. Roadway Express, of course, also seeks enforcement of Bell's discharge, but has intervened in his appeal because it disagrees with the Board's reasoning, *i.e.,* that his conduct would have been protected but for his bad faith.

**7.** In *Interboro,* one employee, on several occasions, asserted rights not only for himself but

We are persuaded ... that a statutory basis for the concerted activity rule announced in *Interboro* is questionable and hence we decline to follow that decision. Moreover, apart from the fact that the *Interboro* decision has not received wide acceptance, there is another reason why it does not apply in the context of this case. *Interboro* is distinguishable on its facts since Smith's activity here did not arise in the framework of an attempt to enforce an existing collective bargaining agreement. Thus, even if we were to fully agree with *Interboro,* this distinction would appear to place the instant case in a wholly different category. The essence of our holding therefore, is that regardless of our analysis of *Interboro,* the result remains the same; the Board's reliance on it for its finding of concerted activity cannot be sustained.

481 F.2d at 719 (footnote omitted).[9]

■ *Buddies Supermarkets* is distinguishable from the instant cases because no collective bargaining agreement was involved in *Buddies Supermarkets.* Nevertheless, we simply cannot ignore the decisive language used in rejecting *Interboro.* The law in this circuit, until stated differently by the court sitting en banc, adheres to the definition of concerted activities announced in *Mushroom Transportation Co. v. NLRB,* 330 F.2d 683, 685 (3d Cir.1964). That is, an individual's conduct may constitute protected concerted activity if engaged in to initiate, induce, or prepare for group action or relate to group action in the interest of other employees. *Accord, NLRB v. Datapoint Corp.,* 642 F.2d 123, 128 (5th Cir. 1981).[10]

The Board presents an attractive argument for *Interboro*'s validity. According to the Board, the collective bargaining process is the quintessence of concerted activity and the enforcement of a collective bargaining right by an employee is a natural continuation of that process. Because collective bargaining is concerted activity, the assertion of a contract right should also be viewed as concerted activity. Furthermore, the action taken by the employer when an employee asserts contract rights will, more often than not, affect other employees. It matters little whether the employee's activity helps other employees; the effect in most instances is felt by others.

If it were not for *Buddies Supermarkets* and *Datapoint,* we might be persuaded by the Board's argument. Until this court sitting en banc directs otherwise, however, we shall follow the language of those decisions. That is not to say that employees Howard and Wilson are without remedy in challenging their warning letters. Both can pursue their contractual claims through their bargaining agent under the grievance procedures provided in the collective bargaining agreement.[11] *See Kohls v. NLRB,* 629 F.2d 173, 178 (D.C.Cir.1980), *cert. denied,* 450 U.S. 931, 101 S.Ct. 1390, 67 L.Ed.2d 363 (1981). Our concern is not with procedure, however, but whether the individual conduct in the instant cases can be termed concerted activities as defined in *Datapoint.* We find that they cannot.

## IV. Conclusion

We enforce that portion of the Board's order affirming the disciplinary action taken against Bell. We deny enforcement of that portion of the order directing Roadway

---

**9.** Three other circuits have specifically rejected the *Interboro* doctrine. *See Kohls v. NLRB,* 629 F.2d 173 (D.C.Cir.1980), *cert. denied,* 450 U.S. 931, 101 S.Ct. 1390, 67 L.Ed.2d 363 (1981); *Aro, Inc. v. NLRB,* 596 F.2d 713 (6th Cir.1979); *NLRB v. Northern Metal Co.,* 440 F.2d 881 (3d Cir.1971).

**10.** The Fifth Circuit reaffirmed this position recently in *Scooba Mfg. Co. v. NLRB,* 694 F.2d 82, 84 (5th Cir.1982).

**11.** Wilson's act of contacting and securing a union steward to accompany him when questioning management officials can be considered concerted conduct protected by section 7 of the Act. *See NLRB v. Weingarten, Inc.,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975). It is difficult to reason, however, that his objective in contacting the steward—to obtain information on the contents of his personnel file—was "concerted activity" as defined in *Datapoint,* 642 F.2d 123, 128. *See Kohls v. NLRB,* 629 F.2d 173, 177 (D.C.Cir.1980), *cert. denied,* 450 U.S. 931, 101 S.Ct. 1390, 67 L.Ed.2d 363 (1981).

Express to expunge the warning letters issued to Wilson and Howard.

ENFORCED IN PART, DENIED IN PART.